## COOPER *v.* NATIONAL FERTILIZER COMPANY *et al.*

1. Where a vendee gives to his vendor a negotiable note for the purchase-price of goods, and the note is discounted before maturity to an innocent purchaser by the payee, who indorses the same, and after default in payment at maturity the maker agrees in writing with the payee that in consideration of the payee procuring from the holder an extension of time of payment he will secure the payee's indorsement by an hypothecation of stock with power of sale, equity will not stay the sale of the stock under the provisions of the agreement for extension because of an alleged partial failure of consideration resulting from a defect known to the maker when he entered into the contract for the extension of time of payment, although the payee be a non-resident without property in this State.

2. Where a manufacturer sells goods for the purpose of resale by his vendee, and delivers some of them in a defective condition, and the vendee with knowledge of such defects resells them to his customers, the manufacturer is not liable on his breach of warranty for an injury to the vendee's business, entailed by the latter's resale of the goods with a knowledge of their defective condition.

3. Section 3 of the act approved December 18, 1901 (Acts 1901, p. 65), recognizes a variance of less than three per cent. between the total commercial value of the fertilizing ingredients as guaranteed and printed on the sacks, and that found by official analysis, as immaterial, relatively to the rights and liability provided by this act.

4. A surety is entitled to proceed in equity against his principal, at any time after the debt has fallen due, to compel payment, although he may not have been sued.

5. Constitutional questions which were not raised by the pleadings, nor passed upon in the trial court, can not be raised for the first time in this court.

Argued December 8, 1908.—Decided April 14, 1909.—Rehearing denied May 12, 1909.

Petition for injunction. Before Judge Worley. Clarke superior court. September 26, 1908.

*John R. Cooper* and *E. K. Lumpkin,* for plaintiff.

*Cobb & Erwin,* for defendants.

EVANS, P. J. In January, 1907, J. C. Cooper purchased 1504 tons of fertilizers from the National Fertilizer Company, of Nashville, Tennessee. The contract was in writing, and provided that the Fertilizer Company agreed to sell to Cooper certain brands of fertilizers at stated prices, which were to contain a certain percentage of fertilizer ingredients, and that Cooper was to sell the fertilizer, take notes from the purchasers, payable to the company, and deliver to the company these notes as collateral for the notes which

34

Cooper was to give to the company. Agreeably to the contract the fertilizer was shipped to Cooper, and Cooper executed to the company seven notes, aggregating $31,726.60, and delivered to the company the notes of the persons to whom he had sold the fertilizer, aggregating $30,544.24, as collateral to his own notes. Before the maturity of the notes of Cooper to the company the latter discounted them with the American National Bank of Nashville, Tennessee, indorsing each note. On September 9, 1907, the company returned the collateral notes to Cooper for collection for the account of the company, the proceeds to be applied to the payment of his notes. Cooper paid his note of $4,000, maturing November 1, 1907, and wrote the bank that because of poor collections he could not meet the other notes at maturity, and asked indulgence. On January 9, 1908, after repeated demands from the company, Cooper surrendered some of the collateral notes upon which there was due about $6,300. On January 16, 1908, Cooper and the company entered into a written agreement the purport of which was that Cooper deposited with the company 292 shares of the stock of the Oconee Oil and Refining Company to secure the company against loss on its indorsements of Cooper's notes held by the bank, and the company agreed to secure an extension on the notes so that Cooper could pay the balance, aggregating $27,326.60 in five installments, beginning in January and ending in June, 1908, each of the installments being for $5,000, except the last, which was to be the balance then due on the debt. Upon the payment of $10,000 Cooper was to have the right to withdraw 100 shares of the hypothecated stock; and upon failure to pay any installment within ten days after it was due, the company was authorized to sell the stock after publication of time and place of sale. Cooper paid $10,000 and withdrew 100 shares of the stock; but he having failed to pay the installment due in May, 1908, the company gave notice of its intention to sell 192 shares of stock, and advertised the same as provided in the contract. Cooper then filed his petition to enjoin the sale, alleging, that the company and the bank were foreign corporations owning no property in Georgia; that the bank was not an innocent purchaser, and the company was liable to him in the sum of $6,000 or other large sum, on account of some of the fertilizer being shipped in defective sacks, and being short in quantity; and that because of these deficiencies, and because two of the brands did

not come up to the guaranteed analysis as printed on the sack, he lost many of his customers, and his business was seriously injured. The prayer was, that the bank be required to bring in the notes, that an accounting be had, and the amount of his damage be ascertained and credited on his notes, and the company be restrained from selling the stock hypothecated until the final hearing. No service was had on the bank, and it never appeared or answered. The company filed an answer denying that Cooper was entitled to any deduction on the notes by way of damages or otherwise; and also an answer in the nature of a cross-bill, in which it was alleged, that the Oconee Oil and Refining Company had sold the most valuable part of its property, and what remained was worth much less than the capital stock; that this company was indebted to Cooper for salary and otherwise; that Cooper had no visible property except about $600 worth of personal property, and it was apprehensive that the 192 shares of stock were insufficient to pay the balance due of the debt, and by way of equitable garnishment it prayed that Cooper be enjoined from collecting any debt due by the Oconee Company to him, and the Oconee Company be enjoined from paying such debts to Cooper. On the interlocutory hearing the court refused to enjoin the sale of the hypothecated stock, and did enjoin the Oconee Oil and Refining Company and J. C. Cooper as prayed in the cross-bill. Cooper excepted.

1-3. We will first notice the phase of the case presented by the application of the plaintiff in error to enjoin the National Fertilizer Company from selling the stock of the Oconee Oil and Refining Company, hypothecated to secure the payment of his notes to it, pursuant to the agreement of January 16, 1908. Briefly stated, the plaintiff's contention is, that he has suffered damage by the Fertilizer Company's breach of contract; that the Fertilizer Company is a non-resident without property in this State, and the sale of the collateral should be stayed until an accounting can be had, and the exact amount of the plaintiff's indebtedness ascertained, which amount the plaintiff avers his willingness to pay. The basis of damage is alleged to be, (1) loss in weight in the fertilizers shipped, (2) cost of resacking fertilizers received in damaged sacks, and (3) injury to his business as a dealer in fertilizers, resulting from the fertilizers being shipped in bad and inferior sacks, and from a shortage in weight, and because the actual and official analysis of

two of the brands fell below the guaranteed analysis printed on the sacks. With reference to the first and second elements of damage there was practically no dispute that at the time Cooper signed the agreement of January 16, 1908, by means of which he procured an extension of the time of payment of his notes, he had knowledge of these deficiencies in the fertilizers. When the plaintiff with such knowledge entered into an agreement, and secured an extension of time of payment of his notes, he waived his right to plead these matters as a defense to his notes. *Am. Car Co.* v. *Atlanta St. Ry. Co.*, 100 *Ga* 254 (28 S. E. 40) ; *Lunsford* v. *Malsby*, 101 *Ga.* 39 (28 S. E. 496) ; *Montfort* v. *Americus Fertilizer Co.*, 108 *Ga.* 12 (33 S. E. 636). On the interlocutory hearing the plaintiff testified, and it was not denied by the defendant, that at the time the agreement of January 16, 1908, was signed, the plaintiff did not know that some of the fertilizer ingredients fell below the percentage contained in the guaranteed analysis as printed on the sacks. In his petition the plaintiff alleged that by reason of the fertilizers "being shipped in bad and inferior bags, and difficult to handle, and shortage in fertilizer ingredients and failure to come up to the guaranteed analysis hereinbefore set forth, and short weights, each and all of which was due to the failure of the said National Fertilizer Company to comply with their agreement as aforesaid, he was injured and damaged in the sum of five thousand dollars ($5,000), in that he lost many of his good and valuable customers, and his fertilizer business was seriously injured; and the said goods so sacked by the said defendant under the brands and name of the petitioner and not coming up to representation, his business was seriously injured thereby. That his fertilizer business dropped from twenty-four hundred (2,400) tons of last year to only some seven hundred (700) tons this year, and that said injury to his said business is serious and permanent, and that it was directly due and caused by the failure of the said defendant to comply with their said contract in shipping inferior goods, short weights, and in inferior and improper bags as aforesaid, and that they are liable to him therefor." There was ample proof before the judge to authorize a finding that at the time the plaintiff received the fertilizers and sold them to his customers he had knowledge of the deficiency in weight and defective sacks, of which he now complains. Having knowledge of such condition of the fertilizers when he sold them, if any injury

to his business accrued from their sale on this account, he could not hold the Fertilizer Company responsible therefor, for the reason that the proximate cause of the injury was his own voluntary act in selling fertilizers which were known to be of short weight, and defectively sacked. *Henderson Elevator Co.* v. *North Ga. Milling Co.*, 126 *Ga.* 279, hn. 5 (55 S. E. 50).

Is the Fertilizer Company liable on its breach of warranty for injury to the plaintiff's business because the quantity of one of the ingredients of two brands of the fertilizer fell slightly below the seller's guaranty, under all the circumstances of the case? One of the brands of the fertilizer was guaranteed to contain phosphoric acid 9%, nitrogen 2.47%, potash 3%. The fertilizer ingredients actually found by the State chemist were phosphoric acid 10.55%, nitrogen 2.10%, potash 3.25%. The commercial value of this brand as claimed by the manufacturer was $21.13, and as actually found by official analysis was $21.09; the difference in commercial value being four cents per ton. Another brand was shown to be deficient in phosphoric acid .75%, and in commercial value twenty-three cents per ton. Of the 1,504 tons purchased, 117 tons were shown to be deficient in commercial value four cents per ton, and 75 tons were shown to be deficient in commercial value twenty-three cents per ton; the deficiency in neither brand amounting to as much as three per cent. of the commercial value. Section 3 of the act approved December 18, 1901 (Acts 1901, p. 65), is as follows: "If any commercial fertilizer or fertilizer material offered for sale in this State shall, upon official analysis, prove deficient in any of its ingredients as guaranteed and branded upon the sacks or packages, and if by reason of such deficiency the commercial value thereof shall fall three per cent. below the guaranteed total commercial value of such fertilizer or fertilizer material, then any note or obligation given in payment thereof shall be collectible by law only for the amount of actual total commercial value as ascertained by said official analysis, and any person or corporation selling the same shall be liable to the consumer, by reason of such deficiency, for such damages, if any, as may be proven and obtained by him on trial before a jury in any court of competent jurisdiction in this State."

There is no common-law duty to brand sacks of fertilizer. This is purely a statutory requirement. The act of 1901 provides that

certain things shall be done, and that certain rights and liabilities shall result from a failure to comply with its terms. Possibly from a recognition of the difficulty of mixing the ingredients into a perfectly uniform composition of great bulk, and that, however earnest an effort might be made to do so, there might be slight variances in the different parts of a large quantity of the fertilizer, and consequently slight variances in different analyses made of samples taken from such parts, the legislature made provision to cover such variances as they deemed reasonable. Had they said in terms that the manufacturer should brand on the sacks or packages an analysis which should be within at least three per cent. of that of the State chemist, or that the requirement of branding should be deemed sufficiently complied with if this branded analysis came within three per cent. of that of the State chemist, the intention would have been plain. Is the case materially different where the act provides that if there is a deficiency in any of the ingredients, and "by reason of such deficiency the commercial value thereof shall fall three per cent. below the guaranteed total commercial value of such fertilizer or fertilizer material," certain rights and liabilities should follow, making the official analysis the test of the reasonableness of the variance in the commercial value? Is not the negative pregnant plain that such results do not follow a variance of less than three per cent.? *Spinks* v. *Rome Guano Co.,* 108 *Ga.* 614 (33 S. E. 906); *Sutherland* v. *Sou. Pac. Guano Co.,* 108 *Ga.* 742 (33 S. E. 811). The plaintiff's case as to this feature does not rest on the alleged violation of any common-law duty by the defendants, but upon a failure to comply with the statute. Were it otherwise, the damages which he could recover for a breach of contract would only be such as "may fairly and reasonably be considered either arising naturally (i. e. according to the usual course of things) from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time they made the contract, as the probable result of the breach of it." Hadley *v.* Baxendale, 9 Exch. 341; *Ga. R.* v. *Hayden,* 71 *Ga.* 522 (51 S. E. 274); Randall *v.* Raper, El. Bl. & El. 84; Civil Code, §§ 3912, 3913.

There is no contention by the plaintiff that his customers refused to pay for fertilizers because of the variance in the percentage of a fertilizing ingredient, or that the variance between the guaranteed

and official analyses was such as to essentially or materially change the constituency of the fertilizer or render it unsuited for use as a fertilizer of the grade and character represented by the guaranteed analysis. Nor is there any contention that the Fertilizer Company knew of any deficiency in the guaranteed analysis. In his sworn petition, and also in his affidavit, submitted on the hearing, the plaintiff arrived at the amount of the damages which he claimed resulted to his business, by estimating his prospective profits per ton on the difference in tonnage between the sales of the years 1907 and 1908.

A plaintiff who seeks reparation in damages to his business, from a breach of contract, is limited to the recovery of damages which are the natural and material consequence of the act from which the damage flows. Loss of prospective profits is ordinarily too remote for recovery. The profits of a commercial business are dependent on so many hazards and chances, that unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's wrongful act, they are too speculative to afford a basis for the computation of damages.

Where no fact is pleaded to reduce the recovery on a note for fertilizers, other than a variance in fertilizer ingredients between the guaranteed and official analyses, and it appears that the total commercial value of the ingredients as ascertained by official analysis comes within three per cent. of the commercial value of the ingredients as guaranteed and branded on the sacks, the vendor may recover the contract price. The law as embodied in the act of 1901 becomes a part of the contract of sale, and such a small discrepancy is declared by the legislature as unavailing to impair the contract of sale. In view, therefore, of the facts before the judge, he was authorized to find that the alleged damages to the defendant's business were neither contemplated by the parties in the sale and purchase of the fertilizers, nor were they the legal consequence of the immaterial variance between the guaranteed and official analyses of two brands of the fertilizer, but that, if the plaintiff's business was injured, the proximate cause was the sale, knowingly made by Cooper, of fertilizer of short weight and in defective sacks.

4. We will next consider the phase of the case presented by the cross-petition, the essential purpose of which is to protect the Fertilizer Company from loss on account of its indorsement of

the notes of Cooper held by the American National Bank, by impounding whatever funds or effects the Oconee Oil and Refining Company may be due to Cooper on account of claims for salary or otherwise. The evidence as to the insolvency of Cooper was conflicting. It appeared that he was a salaried officer of the Oconee Company. The court enjoined the Oconee Company from paying over any money to Cooper until the final decree in the case. The·cross-petition partakes of the nature of an equitable garnishment, and the right to the relief prayed is predicated on the absence of any common-law remedy, and the equitable right of an indorser to compel the payment of the notes. It is undisputed that the notes of Cooper which the Fertilizer Company indorsed are held by an innocent purchaser for value before maturity, and at the time of this proceeding were past due. Under the agreement of January 16, 1908, relatively to Cooper, the Fertilizer Company sustained the relation of surety. Our code does not give to a surety or indorser who has not paid the debt the remedy of garnishment. But equity affords a remedy by entertaining a petition at the instance of the surety against his principal, at any time after the debt has fallen due, to compel payment, although he may not have been sued. Bispham's Eq. §331; 16 Enc. Pl. & Pr. 951; *Sanford* v. *United States Fidelity Co.,* 116 *Ga.* 689 (43 S. E. 61). Under the averments of the cross-petition and the evidence submitted, the court did not abuse its discretion in restraining Cooper from collecting any debt which might be due him by the Oconee Oil and Refining Company.

5. The judgment complained of is alleged to be erroneous, because its effect is to deprive the plaintiff in error of certain constitutional rights and guaranties, viz.: the right of trial by jury, the right of appeal to the courts, the right to appear in the courts by person or attorney, due process of law, and protection of person and property; and that its effect is also to violate the fundamental principle that where there is a right there is a remedy. None of these constitutional questions were raised in the pleadings, nor does the record disclose that such were passed upon by the trial judge.          *Judgment affirmed. All the Justices concur.*